**Affirmed and Opinion Filed August 3, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00245-CV

### IN THE INTEREST OF J.C., A CHILD

### On Appeal from the 304th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. 13-00345W

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Whitehill
Opinion by Justice Francis

This is an appeal from a final decree terminating the parental rights of A.K.O. (Mother) and J.A.C. (Father) to their son, J.C., and denying placement of J.C. with his paternal grandparents, L.C. and M.M. Mother, Father, and Grandparents separately appealed. We affirm.

J.C. was born December 9, 2012. At the time of his birth, J.C. tested positive for opiates, but a child abuse finding on Mother was ruled out because she had a valid prescription for hydrocodone. Over the next three months, CPS received reports that J.C. was being neglected. According to the allegations, Mother and Father were using heroin and methamphetamine, were paranoid and hallucinating, and were selling methamphetamine. J.C. was present during "almost daily" bouts of domestic violence between his parents who were both aggressors. The infant was reportedly sick from being fed bad milk and had a boil on his buttocks from diaper rash because his parents did not clean or adequately bathe him. In response to the reports, CPS tried several

times to contact Mother and Father in person and by mail, but the family moved around and CPS could not locate them.

Finally, on March 7, 2013, J.C.'s paternal grandfather, L.C., contacted CPS and reported that Mother, Father, and J.C. were staying with him in Longview. After the worker explained there was an open investigation, L.C. took the family to the Longview CPS office, where Mother and Father were drug tested. Both tested positive for opiates, and additional tests showed both were also positive for methamphetamine, amphetamine, heroin, and marijuana. The case was transferred to Longview, and J.C. was placed with Grandparents. L.C. worked nights and slept during the day, so M.M. (paternal step-grandmother) was J.C.'s primary caregiver and supervised parental visits.

After a few weeks, Mother and Father tired of being "under the thumb of the placement" and wanted to leave with J.C. M.M. tried to dissuade them, explaining they could lose custody of J.C. permanently if they took him in violation of the agreement. Mother and Father ignored M.M.'s pleas, took J.C., and returned to Dallas. M.M. immediately reported the incident to the Longview CPS office which, in turn, notified the Dallas office.

Within days, Dallas CPS took custody of the child, placed him in a foster home, and filed an original petition for conservatorship and termination of parental rights. Over the next several days, CPS obtained temporary orders, and Mother and Father were ordered to participate in services. Although Grandparents were considered for placement and a home study was ordered, L.C. backed out, citing the "responsibility with day care" and their ages. Home studies were also done on the maternal grandmother and a maternal aunt, but neither was recommended as a possible placement.

On February 5, 2014, the parties resolved their dispute through a mediated settlement agreement. The MSA was signed by the parents and their attorneys, the paternal Grandparents,

and CPS, among others. The opening paragraph warned in boldfaced, capitalized, and underlined type that:

**THE FOLLOWING MEDIATED SETTLEMENT AGREEMENT IS NOT SUBJECT TO REVOCATION AND IS ENTERED INTO PURSUANT TO SECTION 153.007 OF THE TEXAS FAMILY CODE. THIS AGREEMENT IS SIGNED BY EACH PARTY TO THE AGREEMENT AND EACH PARTY'S ATTORNEY WHO IS PRESENT AT THE TIME THE AGREEMENT IS SIGNED. A PARTY IS ENTITLED TO JUDGMENT ON THIS MEDIATED SETTLEMENT AGREEMENT NOTWITHSTANDING RULE 11, TEXAS RULES OF CIVIL PROCEDURE, OR ANOTHER RULE OF LAW.**

Further, the last paragraph immediately preceding the parties' signatures reiterated in boldfaced, capitalized, underlined type that the MSA was binding and not subject to revocation.

As relevant to this appeal, the MSA required a home study be conducted on Grandparents' home and, if approved, J.C. would be placed with Grandparents, who would be named Permanent Managing Conservators of J.C. and Mother and Father would be named Permanent Possessory Conservators. If the home study was not approved, the parents were entitled to request a placement hearing to determine whether J.C. should be placed with Grandparents. If the court denied placement, the parents agreed that their parental rights would be terminated based only on family code section 161.001(1)(o) (failure to complete court-ordered services) and best interest of the child. In addition, the Department would be appointed Permanent Managing Conservator with all rights under the family code, including the right to consent to adoption. The parties agreed the MSA was in J.C.'s best interest.

Thereafter, a home study was conducted on Grandparents' home in Longview but was denied by CPS, meaning placement was not recommended. As provided in the MSA, Father then filed a motion with the trial court requesting the child be placed with Grandparents. A placement hearing was held before the associate judge.

At the hearing, Courtney Knapp, an independent subcontractor for Covenant Kids, testified she conducted the home study on Grandparents' home. Although she did not make a recommendation on placement, she voiced a number of concerns with placing J.C. with Grandparents. To begin with, L.C. left early during the two scheduled interviews and she could not get all the information she needed. Knapp acknowledged this raised a red flag about L.C.'s level of commitment. She tried to follow up by email, but was still unable to obtain all the necessary information. When Knapp attempted to contact L.C. by phone, he refused to speak to her and relayed, through M.M., that he was not going to answer any more of her questions and asked for the phone number of Knapp's supervisor. Additionally, Knapp said Grandparents refused to answer some questions regarding parenting styles and their relationship as parents. Some of the information was later obtained by Knapp's supervisor.

Knapp also had concerns with L.C. and M.M. L.C. had multiple arrests in the past for drug-related offenses. However, the evidence showed L.C. went through substance abuse treatment more than twenty years ago and had remained sober since that time.

As for M.M., she would have been J.C.'s primary caregiver since L.C. worked nights. Knapp said that during the interviews, M.M. appeared to have "difficulty concentrating." M.M. could not stay "on topic," was "rambling at times," had watery eyes, and was easily tearful. When Knapp asked M.M. about this, M.M. explained she slept during the day and was up at night so that she could keep the same schedule as her husband. She said she had just awakened prior to the appointment. Although M.M. reported extensive medical problems, M.M. did not attribute her behavior to any of her medications.

M.M. had been diagnosed with chronic fatigue syndrome, hypertension and fluid retention, acute immune connectivity tissue disorder, chronic nerve pain from a nerve and muscle disorder, muscle spasms, stomach irritation, and autoimmune arthritis. M.M. had been

–4–

disabled since 2005, and her conditions were progressive and would deteriorate over time. Although M.M. reported that her conditions were under control, she told Knapp she had difficulty getting up and down, needed rest frequently, and needed extra time to perform tasks. M.M. took various medications, including methadone, two to three times daily to control the muscle pain and spasms. Given the information M.M. provided about her limitations and medications, Knapp said she was concerned about M.M.'s ability to physically care for J.C., who was almost sixteen months old at the time of the placement hearing.

Knapp's final concern involved whether Grandparents could protect the child from his parents. J.C. had been previously placed with Grandparents, but the placement "broke down" because M.M. failed to prevent Mother and Father from taking him when she knew the parents were using drugs. Knapp acknowledged, however, that M.M. told her she contacted CPS as the parents were leaving her home.

Apart from these concerns, Knapp testified Grandparents could financially support J.C. and there was room in their house for him. She also acknowledged Grandparents understood possible behaviors of abuse and neglected children.

In her testimony, M.M. addressed the concerns identified by Knapp. She explained that Knapp arrived an hour late for the first visit, and L.C. had to leave to go to work. When Knapp came a second time, L.C. again had to leave early because he had an appointment before he had to be at work. To explain Knapp's observations that she was rambling and not staying on topic, M.M. explained she slept during the day to keep L.C.'s schedule and had just awakened before Knapp arrived. If the court placed J.C. with them, M.M. said she would change her schedule from sleeping during the day and staying up at night so that she could care for J.C. M.M. denied Knapp's allegation that she and L.C. refused to answer questions about how they interact as

parents, saying they discussed how children should be raised, parental discipline, and how they would resolve disagreements between them.

With respect to her health, she acknowledged her multiple medical conditions, which she said were treated with various prescription medications. M.M. said she takes a "fraction" of a valium when needed for "breakthrough muscle spasms," methadone for the nerve and muscle disorder, and anti-inflammatories. One of her medications initially caused her to be sedated, but she said the dosage had since been adjusted and no longer caused her problems. M.M. testified that if she takes her medications as prescribed, they control all of her symptoms and she can function without limitations. She further explained she was able to raise three children while suffering from these same conditions and frequently babysits J.C.'s two half-brothers. If she needed help with J.C., she said she could ask a niece or neighbor with teen-age daughters. She also mentioned the Mother's Day Out programs at the local churches as a possible resource.

As for whether she could adequately protect J.C. from his parents, M.M. explained that on the day Mother and Father absconded with J.C., she tried to discourage them but did not believe she had "legal standing" to stop them. She said if the court ordered placement with them this time, she would have the "legal right to block their access."

Finally, M.M. testified she had not seen J.C. in ten months and had not called to arrange any visits with him. By way of explanation, she said she was told that grandparents could visit for only thirty minutes (a claim denied by CPS), and it was a three-hour drive and cost $130 to $140 for gasoline. Also, she said since L.C. worked nights, she did not feel comfortable making the trip alone.

L.C. testified he worked from 6 p.m. to 6 a.m. but would be able to help with J.C.'s care during part of the day. He also said he had family to assist him and M.M. He was also comfortable with M.M. providing primary care for J.C., despite her health. Since J.C. had been

in foster care, L.C. had seen him once in court. He said he had not seen him more because "[i]t's a drive."

Sherrell Taylor was the CPS caseworker assigned J.C.'s case. She said he was removed from the parents' care because of allegations of both domestic violence and drug use by the parents. At the time of the removal, the parents were given a service plan that was designed to return J.C. to his parents. Father had not completed any services, and Mother completed only the drug assessment.

Taylor said J.C. was currently in a single-parent foster home, and the foster mother is interested in adopting him. She had met with the Grandparents and had also been to J.C.'s foster home. She did not believe Grandparents' home was safe or suitable for J.C. and identified the same concerns as Knapp. Although J.C. was in a single-parent home, she did not believe the quality of his care had been compromised. She said J.C. had been there for ten months and had bonded with his foster mother, who was caring for him. She was concerned that L.C. had declined the opportunity a year earlier to take J.C. into his home. She also said there had not been discussions regarding future contact with his half siblings, although she acknowledged that would be important. According to Taylor, the parents had never raised the question as to sibling visitation nor had anyone ever told CPS where J.C.'s half siblings live.

Natasha Hooks was the CPS supervisor assigned to J.C.'s case and said she was the person who denied the home study on Grandparents. According to Hooks, CPS had a "serious concern" with the fact that the parents absconded with J.C. while he was in the Grandparents' care. Her position had not changed after hearing all the testimony and, in particular, M.M.'s explanation.

Jacquie Klein, the CASA advocate assigned to the case, said she had been involved with J.C. and believed it was in his best interest to remain with his foster mother. Klein said J.C. had

lived with his foster mother for all but about three months of his life. Based on what she had read in the home study, what M.M. had told her about her medical conditions, and her independent research of those medical conditions, she agreed with CPS's assessment to deny the home study on the Grandparents.

At the conclusion of the hearing, the associate judge denied placement with Grandparents and terminated the parental rights of Mother and Father. After the associate judge's ruling, Mother filed a motion for reconsideration, Grandparents filed a petition in intervention and a motion to dismiss CPS's petition, and CPS filed a motion for entry of judgment. Subsequently, the trial court heard the motions on the same day. After reading the statement of facts from the placement hearing and hearing additional evidence, the trial court made several oral findings, granted Mother's motion to reconsider, reconsidered the case, and found "all prerequisites were met" to find there was clear and convincing evidence to terminate her rights under section 161.001(o) and that termination was in the best interest of the child. The trial court also found the associate judge denied placement after hearing evidence and argument of counsel and affirmed the findings of the associate judge. In its written decree of termination, the court denied the placement requests of Mother and Father, terminated the parental rights of Mother and Father to J.C., and appointed CPS as Permanent Managing Conservator of J.C.

## GRANDPARENTS' APPEAL

In their sole issue, Grandparents contend the trial court abused its discretion in determining that placement in their home would not be in J.C.'s best interest. We review a conservatorship determination for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.). A trial court abuses its discretion when it acts arbitrary or unreasonable, without reference to any

–8–

guiding rules or principles.  *H.N. v. Dep't of Family & Protective Svcs.*, 397 S.W.3d 802, 816 (Tex. App.—El Paso 2013, no pet).

The primary consideration in determining conservatorship is always the best interest of the child.  TEX. FAM. CODE ANN. § 153.002 (West 2014).  In determining whether the appointment of a party as managing conservator is in the child's best interest, courts consider both section 263.307 factors as well as the factors set out by the supreme court in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976); *In re A.C.*, 394 S.W.3d at 644.  Statutory factors relevant to this case include the child's age and physical and mental vulnerabilities, the magnitude, frequency, and circumstances of harm to the child, whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home, whether there is a history of substance abuse by the child's family or others who have access to the child's home.  TEX. FAM. CODE ANN. § 263.307(b)(1), (3), (7) & (8) (West 2014).  The *Holley* factors include (1) the child's desires, (2) the current and future physical and emotional needs of the child, (3) the current and future physical danger to the child, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child, (6) plans for the child by the person seeking custody, (7) stability of the home, (8) acts or omissions of the parent that may indicate that the parent-child relationship is not proper, and (9) any excuse for acts or omissions of the parent.  *Holley*, 544 S.W.2d at 371–72.

Here, the evidence at the placement hearing showed that from birth to his removal by CPS almost four months later, J.C. was exposed to drug use and domestic violence by his parents.  Since his removal, he had been in the same foster home and had bonded with his foster mother, who cared for him and hoped to adopt him.  In assessing Grandparents' home as a potential placement, CPS identified a number of concerns.  Specifically, there was evidence

regarding (1) L.C.'s seeming disinterest in the placement of J.C. in his home, given that at the time of J.C.'s removal, he backed out of a home study, and when he changed his mind several months later, left during the middle of two home study interviews; (2) L.C.'s prior issues with substance abuse, although he apparently had been sober for the past twenty years; (3) M.M.'s disabling health conditions, which were treated with a number of medications, including methadone and another drug that had left her sedated and tired in the past, raising questions as to whether she would be able to care for an active toddler then and into the future; and (4) Grandparents' prior inability to prevent the drug-addicted parents from absconding with the child. In addition to these concerns, the evidence showed that, at the time of the placement hearing, Grandparents had not seen J.C. in ten months nor had they ever attempted to arrange any visits with him, primarily because the trip was long and expensive.

Grandparents tried to negate CPS's concerns by providing explanations as to why they had not established regular visitation with J.C. since his placement in foster care, how they would handle a future encounter with Mother and Father to prevent harm to the child, and why M.M.'s health conditions would not interfere with her ability to raise J.C. Grandparents expressed their desire to care for J.C., and there was evidence they could financially support him and understood the behaviors of abused and neglected children. And they stressed they would be in a position to ensure J.C. had a relationship with his half siblings, although there was no evidence in the record that J.C. had ever had contact with his half siblings or that the issue was ever raised by his parents or Grandparents prior to the day of the placement hearing. So, while there may have been some controverting or explanatory evidence, the court as the factfinder was the sole arbiter of the witnesses' credibility and the weight that their testimony should be afforded. *See Wyatt*, 104 S.W.3d at 340. Considering the relevant statutory and *Holley* factors,

–10–

we conclude the court could have reasonably determined that placement with Grandparents was not in J.C.'s best interest. We overrule Grandparents' sole issue.

MOTHER'S APPEAL

In two issues, Mother argues the evidence is legally and factually insufficient to support the best interest finding because the associate judge decided that parental rights must be terminated prior to determining whether the child should be placed with his Grandparents. Mother relies on the associate judge's comments at the conclusion of the placement hearing:

> I think - - I think there's no question that the parental rights have to be terminated. There's no question whatsoever. I think their behavior, their lack of attention to this child, you know, tells me how severe this -- their addictions are. And I -- I think there will be more harm to this child if we don't -- if I don't find that there are grounds to terminate and that termination was the best interest of this child.
>
> I believe that the grandparents, both sets, have wonderful desires for this child, but I have concerns. I have concerns because they love their children, and it's very hard to decide between your child and your grandchild. And that's what concerns me the most.
>
> So, I am going to order that the conditions in the mediated settlement agreement be enforced, and I am not going to place the child with either grandparent. That concludes the record.

She argues the associate judge addressed the issue backwards. Rather than first addressing placement as required by the MSA, Mother contends the associate judge terminated the parents' rights and then denied placement with Grandparents without considering whether it was in J.C.'s best interest. Consequently, she argues, the evidence is legally and factually insufficient to support a finding that termination of her rights was in J.C.'s best interest.

Having read the above passage from the associate judge's ruling in the context in which it was given, we cannot agree. At the beginning of the hearing, the associate judge stated she was hearing Father's motion for further orders, which sought placement with Grandparents. Ten witnesses testified, and the evidence concerned the home study conducted on Grandparents, the denial of the home study by CPS, and whether it was in J.C.'s best interest to be placed with

Grandparents. At the conclusion of the evidence, lawyers for Mother and Father both argued in favor of placing the child with Grandparents, while CPS and J.C.'s guardian ad litem argued otherwise. CPS specifically urged the Court to adopt the mediated settlement agreement as a binding order "once a decision is made with regard to placement." At the conclusion of the argument, the associate judge immediately stressed that "everybody wants what's best for this child." It does not necessarily follow that just because the associate judge addressed termination first that she did not actually consider placement first. As we read the ruling in the context in which it was made, the associate judge explained she was terminating the parental rights because she did not believe Grandparents could protect J.C. from his parents (which was consistent with evidence that the parents previously absconded with the child) and therefore denied placement with them. Given those circumstances, she ordered the conditions in the MSA enforced, meaning that the parental rights had to be terminated because the child was not placed with Grandparents.

Even if Mother's interpretation is correct, however, Mother filed a motion to reconsider with the trial judge. The record shows the trial judge granted Mother's motion, "reconsidered the case," and then found that "all prerequisites were met to find that there was clear and convincing evidence" to terminate her rights under section 161.001(o) and that termination was in J.C.'s best interest. The "prerequisites" were found in the MSA, where Mother agreed that if the trial court denied placement in Grandparents' home, Mother's rights would be terminated based on ground "O" and best interest of the child. The trial judge also found Mother freely and voluntarily entered into the MSA, a finding Mother does not challenge. To the extent Mother complains there is no express finding that placement with Grandparents was not in J.C.'s best interest, such a finding would be implied with the denial of placement and we have concluded the evidence supports such a finding. We overrule both issues.

FATHER'S APPEAL

Father's court-appointed counsel filed an *Anders* brief on his behalf, concluding that after a diligent review of the record, his appeal is frivolous and without merit. *See Anders v. California*, 386 U.S. 738 (1967); *In re D.D.*, 279 S.W.3d 849 (Tex. App.—Dallas 2009, pet. denied).

In reviewing an *Anders* brief, our duty is to determine whether there are any arguable grounds for reversal and, if there are, to remand the case to the trial court for the appointment of new counsel. *Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005); *In re D.D.*, 279 S.W.3d at 850. The *Anders* brief filed by Father's appellate counsel presents a professional evaluation of the record demonstrating why there are no arguable grounds for reversal. Counsel reviewed the record, explained how the Department became involved in this case, set out the mediated settlement agreement signed by Father and his trial counsel, and analyzed the agreement for statutory compliance. Counsel concluded the MSA complied with the family code. Counsel further concluded that, after diligently reviewing the record and the applicable law, the appeal was frivolous and without merit.

This Court sent Father a copy of the brief and notified him of his right to review the appellate record and file a pro se brief. Father did not respond. We have reviewed the entire record and the brief. The record does not reflect any arguable grounds for reversal, and we conclude Father's appeal is frivolous and without merit. We grant counsel's motion to withdraw.

Having concluded the issues raised by Grandparents and Mother are without merit and Father's appeal is frivolous and without merit, we affirm the trial court's decree of termination.

150245F.P05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF J.C., A CHILD,

No. 05-15-00245-CV

On Appeal from the 304th Judicial District Court, Dallas County, Texas
Trial Court Cause No. 13-00345W.
Opinion delivered by Justice Francis; Justices Lang-Miers and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that all parties bear their own costs of this appeal.

Judgment entered August 3, 2015.